UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| AMAR GILMORE, | ) |
| Plaintiff, | ) |
| v. | ) No. 2:16-cv-00209-JMS-MJD |
| DAVID DECKER, *et al.*, | ) |
| Defendants. | ) |

**Entry Rejecting Exhaustion Defense Following *Pavey* Hearing**

Plaintiff Amar Gilmore, who at all times relevant to this action was a federal inmate incarcerated at the Federal Correction Institution in Terre Haute, Indiana ("FCI Terre Haute"), brought this action pro se against the United States of America, David Decker, Genevieve Daughtery, and Sarah Walters. Mr. Gilmore asserts a claim under the Federal Tort Claims Act against the United States and Eighth Amendment claims against David Decker, Genevieve Daughtery, and Sarah Walters (the "Individual Defendants") based on his alleged receipt of deficient medical treatment while under their care. The Individual Defendants moved for summary judgment on the ground that the plaintiff failed to exhaust his administrative remedies before bringing this suit. The Court denied summary judgment due to material factual disputes regarding the availability of the administrative remedy process. A hearing was held pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), to resolve the exhaustion defense, at which Mr. Gilmore was represented by recruited counsel. For the reasons explained below, the Individual Defendants failed to carry their burden to establish that the administrative remedy process at FCI Terre Haute was available to Mr. Gilmore. Their exhaustion defense is therefore **rejected**, and Mr. Gilmore's Eighth Amendment medical claims will proceed against the Individual Defendants.

# I.
# Findings of Fact

The following facts are based on the undisputed evidence and the evidence presented at the *Pavey* hearing deemed credible by the Court.

### A. Mr. Gilmore's Health Issues and Hospitalization

Mr. Gilmore brought this action against the Individual Defendants based on his alleged receipt of deficient medical treatment on January 27 and 28, 2015.[1] Mr. Gilmore's medical records establish that he began experiencing medical issues at least as early as January 2015. He was transported to Union Hospital on February 9, 2015, and remained there until his release back to FCI Terre Haute on April 1, 2015. During this period he experienced renal failure, and his treating physicians thought there was a chance he would die in the hospital. Mr. Gilmore's return to FCI Terre Haute did not last. He was taken to Union Hospital Emergency Room a week later, on April 8, 2015, where he was found to be in shock. After undergoing dialysis and multiple blood transfusions over a two-week period, Mr. Gilmore was returned to FCI Terre Haute on April 21, 2015. He gradually recovered from his conditions over the next several months.

### B. The Administrative Remedy Process

The Federal Bureau of Prisons ("BOP") promulgated an administrative remedy process, codified in 28 C.F.R. § 542.10, that was in effect at all times relevant to this case. The administrative remedy process allows an inmate to seek formal review of a complaint related to any aspect of his imprisonment. To exhaust his administrative remedies under this process, an

---

[1] The Individual Defendants suggest for the first time in their post-hearing proposed findings of fact and conclusions of law that the deficient medical treatment forming the basis of Mr. Gilmore's claims occurred on April 29, 2015, rather than on January 27 and 28, 2015. But a fair reading of Mr. Gilmore's Complaint, supported by both his testimony at the hearing and his BP-8 and the BP-8 response, demonstrate that the alleged deficient treatment occurred on the January dates.

inmate must first file an informal remedy request through the appropriate institution staff member (BP-8). If the inmate is not satisfied with the response to his informal request, he is required to file his complaint with the Warden of his institution (BP-9). *See* 28 C.F.R. § 542.14. The deadline for completion of these two steps is twenty days following the date on which the basis for the request occurred. *See* 28 C.F.R. § 542.14(a).

"Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed." 28 C.F.R. § 542.14(b). "In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame." *Id.* "Valid reasons for delay include," as relevant here, "an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal." *Id.* "Ordinarily, the inmate should submit written verification from staff for any claimed reason for delay." *Id.*

If the inmate is dissatisfied with the Warden's response to the BP-9, he may appeal the decision to the Regional Director (BP-10). *See* 28 C.F.R. § 542.15. Finally, if an inmate is dissatisfied with the Regional Director's response, he may appeal to the General Counsel (BP-11). *See id.* Once the General Counsel has responded to the BP-11, an inmate has exhausted all of his administrative remedies.

When any administrative remedy request is rejected, "the inmate shall be provided a written notice . . . explaining the reason for rejection. If the defect on which the rejection is based is correctable, the notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal." 28 C.F.R. § 542.17(b).

### C. Mr. Gilmore's Attempts to Utilize the Administrative Remedy Process

Mr. Gilmore remained at FCI Terre Haute after returning from his second stay at Union Hospital on April 21, 2015. It appears undisputed—and to the extent there is a dispute, the Court

finds based on the medical records and Tracy Joslyn's testimony—that Mr. Gilmore was physically unable to file a grievance prior the competition of his second stay at Union Hospital on April 21, 2015, due to his dire health issues. When he returned, Mr. Gilmore knew that any grievance he filed would be late under the grievance policy, since the BP-8 and BP-9 steps must be completed within twenty days of when the incident occurred, which was late January.

Mr. Gilmore acknowledged that his counselor, Ms. Joslyn, could have helped him fill out a BP-8 when he returned to FCI Terre Haute on April 21, 2015, but he was not ready to file it then. He credibly explained that, while he could have sought assistance filing his BP-8 then, he knew it was untimely no matter when he filed it. Nevertheless, the Court finds that Mr. Gilmore was physically capable of filing his BP-8 beginning on April 21, 2015. The evidence shows that Mr. Gilmore was capable of performing other similarly difficult activities at the time, such as ordering items from commissary.

On June 15, 2015, Mr. Gilmore told Ms. Joslyn he wanted to submit a BP-8 regarding his allegedly deficient medical care. She informed him that it was untimely under BOP policy, and he responded that he was in the hospital during the twenty-day period to file the BP-8. Ms. Joslyn responded that she knew he was in the hospital, thus even though it was late, she would file it. She never told Mr. Gilmore that he needed to provide any additional information explaining why the BP-8 was late, which made sense to Mr. Gilmore because she knew why it was late and it was also obvious to anyone who read the complaint.

Mr. Gilmore's BP-8 stated that he was not provided adequate medical attention while he was in the Secured Housing Unit ("SHU"). His grievance was rejected on the merits on June 15,

2015, even though BP-8s can be rejected as untimely.[2] The reviewing staff member noted that Mr. Gilmore was properly evaluated and treated for chest and back pain when he was in the SHU on January 28 and 29, 2015, and checked a box on the rejection form stating that an informal resolution was not reached and Mr. Gilmore should "[p]rogress to BP-9." Filing No. 1-1 at 3. Although Mr. Gilmore was instructed to progress to BP-9, he was not told that he needed to submit any additional information explaining why the BP-8 and BP-9 were untimely.

Mr. Gilmore submitted his BP-9 to the Warden on June 22, 2015, and it was received on June 30, 2015. Again, Mr. Gilmore knew that he was submitting his BP-9 past the twenty-day deadline. Melinda Caulton, the associate warden secretary, processed Mr. Gilmore's BP-9. Her duties also included those of the administrative remedy clerk, which required her to investigate the allegations in BP-9s and submit a recommendation to the Warden regarding their proper resolution.

The entirety of Ms. Caulton's investigation was to contact medical staff to inquire what days Mr. Gilmore was in the hospital. They informed her that he returned from the hospital in April 2015. She did not receive any additional information about his health condition or his ability to file a grievance upon his return, nor did she know that he was readmitted to the hospital a second time in April 2015. Ms. Caulton used the date that Mr. Gilmore returned to FCI Terre Haute (although which of the two return dates in April is unclear) as a basis to recommend that Mr. Gilmore's BP-9 be rejected as untimely, given that June 22, 2015, was more than twenty days past

---

[2] The Individual Defendants' witnesses offered contradictory testimony regarding whether a BP-8 could be rejected as untimely. The Court credits the testimony of Mr. Gilmore's counselor, Ms. Joslyn, who regularly processes BP-8s and specifically testified that they have been rejected as untimely. *See* Hearing Tr. at 152. The Court does not credit the testimony of Melinda Caulton, who regularly processes and assists in responding to BP-9s, who testified that a BP-8 will never be denied as untimely. *See* Hearing Tr. at 115, 117.

either April return date. She calculated the timeliness in this manner even though she acknowledged that BOP policy does not set forth when the twenty days begins to run in instances where there is a valid reason for the untimely submission of a grievance.

There was no submission, note, or other communication from prison staff that sought to explain or excuse the untimeliness of Mr. Gilmore's BP-9. Ms. Caulton made clear that any communication from a staff member is generally sufficient to excuse untimeliness. Nevertheless, there is no stated requirement that an inmate provide this information, and Ms. Caulton, as part of her investigative duties, could have reached out to staff regarding the timeliness issue, but did not do so other than as set forth above.

Mr. Gilmore's BP-9 was ultimately rejected by the Warden on the basis recommended by Ms. Caulton. Specifically, the BP-9 rejection stated, "for the reasons listed below, this administrative remedy request is being rejected and returned to you. . . . Reject Reason 1: Your request is untimely. Institution and CCC requests (BP-09) must be received w/20 days of the event complained about." Filing No. 1-1 at 13. The rejection did not state whether the untimeliness was correctable, nor provide Mr. Gilmore an extension of time to correct the error and resubmit his BP-9. Moreover, the rejection did not explain the actual basis for the decision—namely, that the timeliness was calculated by counting twenty days from when Mr. Gilmore returned from the hospital in April 2015.

Mr. Gilmore subsequently filed a BP-10 and BP-11 regarding this incident, both of which were rejected. The BP-10 rejection notice instructed Mr. Gilmore to address his complaint at the institution level and informed him that he "may file an appeal after receiving [the] warden['s] response." Filing No. 1-1 at 11. The BP-11 rejection notice stated that it "concur[red] with [the] rationale of [the] regional office and/or institution for rejection." Filing No. 1-1 at 7.

# II.
# Discussion

## A.     Legal Standards Governing Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e; *see Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532 (citation omitted). Moreover, the "exhaustion requirement is strict. A prisoner must comply with the specific procedures and deadlines established by the prison's policy." *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015).

"At the same time, the [PLRA] requires exhaustion only of remedies that are 'available.'" *Id.* There are "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). First . . . an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, administrative remedies are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," such as when prison official "devise procedural systems (including the blind alleys and quagmires just discussed) in order to trip[] up all but the most skillful prisoners." *Id.* at 1860 (citation and quotation marks omitted).

The exhaustion requirement "is an affirmative defense that a defendant has the burden of proving." *King*, 781 F.3d at 893. This includes the burden of proving that the administrative remedy process was available. *See Thomas v. Reese*, 787 F.3d 845, 848 (7th Cir. 2015) ("Because exhaustion is an affirmative defense, the defendants must establish that an administrative remedy was available and that [the plaintiff] failed to pursue it."); *Kaba v. Stepp*, 458 F.3d 678, 686 (7th Cir. 2006) (holding that the defendants failed to meet "their burden of proving the availability of administrative remedies").

B.  Analysis

The Supreme Court has held that an administrative remedy process is unavailable to an inmate when it is "so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Ross*, 136 S. Ct. at 1859. As explained further below, this is precisely the situation Mr. Gilmore faced for at least three related reasons. First, the timeliness of Mr. Gilmore's BP-9 was calculated based on a method not found anywhere in the administrative remedy policy. Second, Mr. Gilmore was not informed in the BP-9 rejection notice that this was how the timeliness was calculated; in fact, he was told it was calculated using the method set forth in BOP policy. Third, Mr. Gilmore was not given an opportunity to correct the untimeliness, which is also required by BOP policy. In sum, after substantial litigation on the issue of exhaustion in this case including three rounds of briefing and an evidentiary hearing, it has become transparent that the BOP's implementation of the administrative remedy process as it pertains to this case was anything but.

The parties both acknowledged that Mr. Gilmore was incapable of complying with the twenty-day deadline for submitting his BP-8 and BP-9 due to his grave illness and lengthy hospitalization. Thus, Mr. Gilmore knew when he returned to FCI Terre Haute (for the second

time) on April 21, 2015, that he could not comply with that deadline. Knowing he was already late, Mr. Gilmore did not seek to file his BP-8 until June 15, 2015. His counselor, Ms. Joslyn, explained that his BP-8 was untimely, but Mr. Gilmore pointed out that she knew he was in the hospital during the relevant time and could not file it. She acknowledged that was true and filed his BP-8. The BP-8 was rejected on the merits, even though it could have been rejected as untimely.[3] This, of course, would lead Mr. Gilmore and any other reasonable inmate to believe that no further explanation of the untimeliness was necessary.

As instructed by the BP-8 rejection, Mr. Gilmore proceeded to the BP-9 stage. His BP-9 was rejected as untimely because the BP-9 "must be received w/20 days of the event complained about," which occurred in January 2015. Filing No. 1-1 at 13. But this was not the actual reason for the rejection. Instead, Ms. Caulton determined that the BP-9 was untimely because it was not filed within twenty days of Mr. Gilmore's return to FCI Terre Haute in April 2015. BOP policy requires the rejection notice to "explain[] the reason for [the] rejection," 28 C.F.R. § 542.17(b), and a false reason, of course, does not comply with this requirement.

Compounding this violation is another. The BP-9 rejection notice did not inform Mr. Gilmore that there were any further steps he could take. This also violated BOP policy, which provides that "[i]f the defect on which the rejection is based is correctable, the notice *shall* inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal." 28 C.F.R. § 542.17(b) (emphasis added). The identified defect—untimeliness—is correctable under BOP policy, as it provides an extension of the twenty-day filing

---

[3] It is an open question whether the fact that the BP-8 was addressed on the merits precludes it from later being rejected as untimely. *See, e.g.*, *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011); *Conyers v. Abitz*, 416 F.3d 580, 585 (7th Cir. 2005); *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004).

deadline "[w]here the inmate demonstrates a valid reason for delay," which includes "an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal." 28 C.F.R. § 542.14(b). Mr. Gilmore was not given an opportunity to explain any additional delay. Moreover, the defect was correctable because Ms. Caulton made clear that any communication from staff explaining the untimeliness is generally sufficient to excuse it.

The problems with the foregoing failures are apparent when viewed from Mr. Gilmore's perspective. They demonstrate that BOP policy clearly contemplated his situation and created a "mechanism . . . to provide relief, but no ordinary prisoner c[ould] discern or navigate it." *Ross*, 136 S. Ct. at 1859. Although BOP policy states that "*[o]rdinarily*, the inmate should submit written verification from staff for any claimed reason for delay," 28 C.F.R. § 542.14(b) (emphasis added), there is no requirement that they do so. Mr. Gilmore was never instructed to provide any staff verification at either the BP-8 or BP-9 stage. It was eminently reasonable for him not to seek one given that he explained his reason for delay to Ms. Josyln when he submitted his BP-8 and the reason was also at least somewhat apparent from the grievances themselves. It was further understandable that he did not submit any staff verification at the BP-9 stage given that his BP-8 was rejected on the merits, without any mention of the obvious untimeliness or need for verification. Then, his BP-9 was denied without any avenue to explain or correct the untimeliness and receive an extension, even though Ms. Caulton made clear that a staff verification would likely have excused Mr. Gilmore's untimeliness.

However, even if Mr. Gilmore had been given an opportunity to cure the untimeliness, the fact that he was not given the actual basis for the decision would have precluded him from doing so. As far as Mr. Gilmore knew, his BP-9 was denied because he did not submit it within twenty days of the incident (late January 2015)—that is, he did not submit it while he was in the hospital.

He had no way of knowing that the actual period he needed a "valid reason" for was the twenty-day period beginning in April 2015 when he returned from the hospital, even though, as Ms. Caulton acknowledged, there is no basis in the BOP policy to begin the twenty-day period at this time.

At bottom, this is about transparency. The BOP has complete control of what its policy requires and how it is implemented. But it chose not to set forth in the policy if or when the twenty-day period begins to run if an impediment to filing exists during the initial twenty-day period. And, contrary to BOP policy, BOP staff chose not to inform Mr. Gilmore of the actual basis on which his grievance was deemed untimely, provide him with an opportunity to correct the deficiency, or at any time inform him that the explanation given for the untimeliness was insufficient or needed to be supplemented with a staff verification in order to be accepted. Had the BOP policy or staff been more transparent, the Individual Defendants may very well have succeeded on their exhaustion defense.[4] But without knowing these things, Mr. Gilmore had no way of knowing how to navigate the process of having an otherwise untimely grievance accepted. Simply put, the administrative remedy process was "so opaque that . . . , practically speaking, [it was] incapable of use" and thus unavailable to Mr. Gilmore. *Ross*, 136 S. Ct. at 1859.

Between the lack of communication to Mr. Gilmore during the administrative remedy process and the inconsistent testimony of BOP witnesses regarding how the administrative remedy process functions—*e.g.*, whether or not a BP-8 can be rejected as untimely—a cynical view is that the process was made just difficult enough for Mr. Gilmore that he could not possibly exhaust his

---

[4] As noted above, the Court finds that Mr. Gilmore could have filed his BP-8 and BP-9 within twenty days of his second return to FCI Terre Haute on April 21, 2015. But for all the reasons discussed herein, not only does BOP policy not require the filing within that timeframe, no one ever communicated to Mr. Gilmore that this was required.

claim. Although the Court does not take the cynical view here, the mere possibility of it reflects the degree to which the administrative remedy process failed Mr. Gilmore in this case.

## III.
## Conclusion

For the reasons explained above, the administrative remedy process was not available to Mr. Gilmore, *see* 42 U.S.C. § 1997e; *Porter*, 534 U.S. at 524-25, and thus the Individual Defendants have not carried their burden on their exhaustion defense. The exhaustion defense is therefore **rejected**. A scheduling order setting forth how Mr. Gilmore's claims against the United States and Individual Defendants shall proceed will issue by separate entry.

The Court previously denied Mr. Gilmore's motion for counsel without prejudice and stated that he could renew his motion once the issue of exhaustion was resolved. He may therefore renew his motion for counsel at this time. The clerk is **directed** to send Mr. Gilmore a copy of the form motion for assistance recruiting counsel along with his copy of this Entry.

**IT IS SO ORDERED.**

Date: 12/20/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

AMAR GILMORE
37661-083
BUTNER - LOW FCI
BUTNER LOW FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 999
BUTNER, NC 27509

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
lroberts@cchalaw.com