UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| AMAR GILMORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-00209-JMS-MJD |
| | ) | |
| DAVID DECKER, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Following Bench Trial on Federal Tort Claims Act Claim**

Plaintiff Amar Gilmore brought this action regarding medical treatment he received while

he was a federal inmate at the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre

Haute"). He brought Eighth Amendment deliberate indifference claims via *Bivens v. Six Unknown*

*Named Agents*, 403 U.S. 388 (1971), against the three Individual Defendants—Registered Nurse

David Decker ("RN Decker"), Registered Nurse Sarah Walters ("RN Walters"), and Physician

Assistant Genevieve Daugherty ("PA Daugherty")[1]—all of whom were medical providers

employed by the Bureau of Prisons ("BOP") during the relevant period. Mr. Gilmore also brought

a negligence claim against Defendant United States of America under the Federal Tort Claims Act

("FTCA"). For both claims, Mr. Gilmore maintains that Defendants provided him deficient

medical care.

The Court held a three-day simultaneous jury and bench trial. Mr. Gilmore's *Bivens* claims

were decided by the jury. The jury found for all three Individual Defendants' constitutional claims.

Mr. Gilmore's FTCA claim, however, must be decided by the Court. *See* 28 U.S.C. § 2402. In

---

[1] Physician Assistant Daugherty's name is now PA Muscatel. The Court uses the former name
throughout because that is the name the parties use and the name that appears in the medical
records.

1

deciding the FTCA claim, the Court considers the evidence submitted to the jury as well as limited additional evidence that was presented outside the jury's presence.

Federal Rule of Civil Procedure 52(a) requires the Court to separately set out its findings of fact and conclusions of law and allows the Court to do so "in an opinion or a memorandum of decision." The following are the Court's findings of fact and conclusions of law required by Rule 52(a). To the extent that any findings of fact are more properly construed as conclusions of law, or vice versa, they should be construed as such.

## I.
## Findings of Fact

### A.    Mr. Gilmore's Medical History and Treatment Prior to Mid-January 2015

Mr. Gilmore was an inmate at FCI Terre Haute from October 24, 2007 through November 13, 2015. During this time, he was under the care of BOP medical staff.

Mr. Gilmore's had two previous pulmonary embolisms, which are blood clot that travel to the lungs and can be fatal. Because of his pulmonary embolisms, Mr. Gilmore was placed on Coumadin—also known as warfarin—while in BOP custody. Coumadin is an anticoagulation medication designed to reduce the risk of blood clots.

A patient's blood is tested to determine if the dosage of Coumadin is effective. That test is known as an International Ratio ("INR") test. A patient's INR is usually tested monthly or less often if the dosage is determined to be in a therapeutic range. A patient taking Coumadin to prevent pulmonary embolisms is considered on a therapeutic dose of Coumadin if the patient's INR is between 2 and 3. When a patient has an INR that is not therapeutic—that is, lower than 2 or higher than 3—the patient is tested more frequently and his Coumadin dosage is adjusted until the patient's INR becomes therapeutic. When a patient's INR is too high his blood is too thin, and the patient is at risk of bleeding. When a patient's INR is too low his blood is too thick, and the patient

is at risk of developing a blood clot.

Throughout 2014, Mr. Gilmore's INR fluctuated, sometimes too high and sometimes too low. Because Mr. Gilmore's INR was often outside of the therapeutic range, the BOP medical staff tested Mr. Gilmore's INR more frequently than once per month. Sometimes the tests were done daily, once a week, or every two weeks. After testing Gilmore's INR, the BOP adjusted Mr. Gilmore's Coumadin dosage to get Mr. Gilmore's INR in the therapeutic range.

Mr. Gilmore could generally "self-carry" his medications, including his Coumadin. That meant that Mr. Gilmore was given the medication bottles, and he was responsible for taking the medications as prescribed. However, when Mr. Gilmore's INR began fluctuating, BOP medical staff suspected Mr. Gilmore was not taking his Coumadin as prescribed. Due to these concerns, BOP staff would occasionally place Mr. Gilmore on "pill line" meaning he could not carry his prescription bottles, but was instead required to get each dose of his medication from BOP medical personnel.

The parties dispute whether Mr. Gilmore consistently took his Coumadin as prescribed. It appears that at certain times Mr. Gilmore did not take his Coumadin consistently, at other times he did, and at other times—such as most of his time in the SHU in January and February 2015, discussed below—he was not provided his Coumadin by the BOP medical staff. As to the latter period, which is when the events giving rise to this action occurred, BOP medical staff was the cause of Mr. Gilmore's non-compliance and they knew he did not have access to his medication. Moreover, whether or not Mr. Gilmore was compliant with his Coumadin during any given period, Mr. Gilmore's Coumadin compliance or lack thereof would not and did not alter any of the BOP medical staff's medical decisions and did not cause the harm at issue here.

**B.    Mr. Gilmore's Health and Treatment Beginning Mid-January 2015**

Mr. Gilmore was under the care of a non-BOP cardiologist, Dr. Thomas Orman, in January 2015. On January 12, 2015, Dr. Orman evaluated Mr. Gilmore due to an abnormal stress test and abnormal electrocardiogram ("EKG"). Mr. Gilmore had coronary artery disease but could not be prescribed Aspirin because he was on Coumadin. Dr. Orman ordered Mr. Gilmore to return for a follow-up appointment in three months.

On January 14, 2015, Mr. Gilmore's INR tested 2.1. At that time, Mr. Gilmore was considered therapeutic and a physician ordered to have Mr. Gilmore's INR re-tested in one month.

On January 26, 2015, Mr. Gilmore felt pain in his chest that stretched around to the center of his back. He signed up for sick call and was seen by United States employee, PA Daugherty. Mr. Gilmore reported that his chest pain intensified when he took a deep breath and that his symptoms were identical to the symptoms he experienced during his two prior pulmonary embolisms. PA Daugherty took Mr. Gilmore's vital signs, which were normal, conducted a physical examination, made a clinical note indicating Mr. Gilmore did not complain of shortness of breath, dizziness, or palpitations, and noted Mr. Gilmore's history of chronic pulmonary embolisms. PA Daugherty administered an EKG to rule out a heart attack, which read as abnormal but unchanged from his prior abnormal EKG. She also noted that Mr. Gilmore had a follow-up appointment with Dr. Orman, but made no mention of the fact that the follow-up appointment was not for three months. PA Daugherty performed no other testing to determine the origin of Mr. Gilmore's chest pain, and she provided him with no treatment for his pain. PA Daugherty sent Mr. Gilmore to his cell and told him to alert staff if his symptoms changed or worsened.

On January 27, 2015, Mr. Gilmore was moved from his regular housing unit to the Special Housing Unit ("SHU"). Mr. Gilmore had taken his Coumadin before being moved to the SHU, but he was not allowed to take his medications or his other property with him to the SHU.

Around 4:00 a.m. on January 28, 2015, Mr. Gilmore woke up with intense chest pain and signed up for another sick call. He was seen by United States employee RN Decker at approximately 6:09 a.m. Mr. Gilmore told RN Decker that he had chest pain radiating into his back for the last two hours and that he had been having similar pain for three days. Mr. Gilmore told RN Decker the pain was the same he experienced with his prior pulmonary embolisms. RN Decker checked Mr. Gilmore's vital signs and noted slightly diminished breath sounds in the right lower lobe of Mr. Gilmore's lungs. RN Decker also performed a physical exam. RN Decker called PA Daugherty—the PA on call—and reported Mr. Gilmore's complaints. PA Daugherty, who had seen Mr. Gilmore 36 hours earlier for the same chest pain that had now worsened. Mr. Gilmore had followed her instruction to notify medical if his condition worsened, but when he did so, the only treatment he received was PA Daugherty's order for a three-day prescription of Tylenol. PA Daugherty ordered no further testing to determine the origin of the pain. RN Decker provided the Tylenol to Mr. Gilmore and repeated the direction to Mr. Gilmore to contact medical staff if his conditions worsened. RN Decker sent Mr. Gilmore back to his cell with no further testing or treatment.

Mr. Gilmore's pain continued to intensify throughout the day, but BOP medical staff informed the correctional officers that they had already seen Mr. Gilmore that day, so he was not taken to medical again during the day. That evening at approximately 5:30 p.m., United States employee RN Heiser stopped by Mr. Gilmore's cell in the SHU. She made an administrative note indicating that Mr. Gilmore was complaining to correctional officers about his deteriorating

health, including severe chest pain. RN Heiser's note indicated she told the RN coming on duty, RN Walters, about Mr. Gilmore's complaints. RN Heiser performed no testing and provided no treatment to Mr. Gilmore.[2]

Mr. Gilmore continued to complain of severe chest pain and requested to see medical staff. At 8:36 p.m. that night, United States employee RN Walters went to the SHU to see Mr. Gilmore because he continued to bang on his cell door asking for medical attention. RN Walters saw Mr. Gilmore sitting on his cell floor leaning against the wall. Mr. Gilmore stated to RN Walters, "It's a blood clot. It's the worst pain. I know what I have. I need some heparin." RN Walters evaluated Mr. Gilmore in the SHU medical room. She took Mr. Gilmore's vital signs. Although they were still within the normal range, they were worsening. RN Walter's knew that Mr. Gilmore had been complaining of severe chest pain for four days. Mr. Gilmore denied missing any doses of Coumadin, because his Coumadin was to be taken later that evening. RN Walters noted that Mr. Gilmore's "recent" INR was therapeutic, but she did not note the date of the INR test or how long Mr. Gilmore had been in the therapeutic range.

RN Walters instructed Mr. Gilmore to continue taking his Tylenol, at which point Mr. Gilmore became irritated, informing RN Walters that the Tylenol is "worthless," that he needed something effective for his pain, and that the lack of treatment was going to "kill him." Like the medical providers who had previously seen Mr. Gilmore, RN Walters told Mr. Gilmore to rest and repeated the hollow mantra that Mr. Gilmore should notify BOP medical staff if his condition worsened. RN Walters did not provide Mr. Gilmore with any treatment for his pain other than the Tylenol, which was clearly ineffective. Nor did she perform any testing to determine the origin of his

---

[2] Beyond the facts set forth herein, the Court does not credit RN Heiser's observations in the administrative note. RN Heiser could have been called to testify but was not.

pain.

Mr. Gilmore's symptoms continued and worsened. He requested sick call on the morning of January 29, 2015, and was seen by RN Decker at approximately 6:17 a.m. Mr. Gilmore continued to complain of severe pain in his lung and radiating to his back, and he rated his pain as a 9 out of 10. He informed RN Decker that the pain had been ongoing for several days and the Tylenol did not relieve it. Mr. Gilmore also told RN Decker he had not received his Coumadin the prior night. RN Decker took Mr. Gilmore's vital signs. Although they remained in the normal range, they continued to worsen. RN Decker noted that Mr. Gilmore had "been assessed multiple times over the past three days" and that Mr. Gilmore was "requesting better pain control." RN Decker did no testing and provided no treatment. RN Decker told Mr. Gilmore that he was scheduled to see the Physician's Assistant.

Approximately six hours later, around 12:30 p.m., Mr. Gilmore was seen again by PA Daugherty. He again reported that his symptoms were the same symptoms he had with his prior pulmonary embolism. PA Daugherty noted that Mr. Gilmore had "pleuritic upper abdominal/diaphragmatic/mid back pain and productive cough." Mr. Gilmore continued to complain of chest pain, even though PA Daugherty's note reflects otherwise. PA Daugherty took Mr. Gilmore's vital signs, which were in the normal range albeit some were at the top of the normal range, meaning they were worsening.[3] PA Daugherty noted that Mr. Gilmore's last INR was therapeutic at 2.1, but she did not note when his INR was last tested or for how long he had been therapeutic. PA Daugherty prescribed Prednisone for Mr. Gilmore's pain and inflammation—

---

[3] BOP medical staff suggested that at least part of the reason they did not send Mr. Gilmore to the ER is because his vital signs were within the normal range. The Court does not credit this as a basis to take no further action to treat Mr. Gilmore. When Mr. Gilmore returned to the prison after his first hospitalization, discussed further below, his vital signs were not within the normal range, yet BOP medical staff simply sent him back to his cell.

which he never received—and a cough suppressant.

PA Daugherty had seen Mr. Gilmore for chest pain on January 26, 2015; she had prescribed three days of Tylenol for Mr. Gilmore's chest pain on January 28, 2015; she (at 7:33 a.m. on January 29, 2015) reviewed RN Heiser's medical encounter with Mr. Gilmore on January 28, 2015, wherein Mr. Gilmore had been complaining of pain, banging on his door asking to see medical; and she had (also at 7:33 a.m. on January 29, 2015) reviewed RN Decker's medical encounter note with Mr. Gilmore at 6:17 a.m. where Mr. Gilmore complained of severe pain in his lung. PA Daugherty had all of Mr. Gilmore's medical records available to her, which showed Mr. Gilmore had not complained of a cough on those prior occasions. Yet, she concluded that the severe chest pain Mr. Gilmore had experienced for five days was caused by a newly developed cough. In the end, PA Daugherty provided no meaningful or appropriate treatment for Mr. Gilmore's worsening chest and lung pain, nor did she undertake any testing to determine the origin of Mr. Gilmore's chest and lung pain. Rather, she told him once again to "follow up with medical as needed." PA Daugherty did no further testing to determine the cause of Mr. Gilmore's chest pains because she knew he was scheduled to see the cardiologist, even though that appointment was still three-months away.

PA Daugherty claimed she took this course because Mr. Gilmore had no symptoms of a pulmonary embolism and that his diaphragm pain was most likely caused by coughing. But the Court does not accept this explanation as a credible basis for PA Daugherty's decisions. Mr. Gilmore complained to her of severe chest pain—a possible symptom of a pulmonary embolism— which he had for multiple days. Moreover, it was not credible that PA Daugherty believed Mr. Gilmore's cough, which had just presented that day, was the cause of his severe chest pain that he had complaining about for multiple days. Whether intentionally or negligently, this was a

medically negligent conclusion to draw.

Ultimately, after multiple appointments over three days during which Mr. Gilmore complained of severe pain, RN Decker and PA Daugherty grew tired of Mr. Gilmore's complaints and constant requests to see medical. Thus, not only did PA Daugherty wrongfully attribute Mr. Gilmore's preexisting chest pain to a later-developed cough, but she and RN Decker decided they were done seeing Mr. Gilmore for these complaints. The consequences of this, detailed below, was that Mr. Gilmore suffered with extreme chest pain caused by a life-threatening medical condition in his cell without any medical attention or treatment for eleven days.

## C.      Mr. Gilmore Suffered for Eleven Days in His Cell Without Medical Treatment

After Mr. Gilmore's appointment with PA Daugherty on January 29, 2015, he did not receive any medical treatment from any BOP employee until February 9, 2015. Every day between January 28, 2015 and February 9, 2015, Mr. Gilmore placed a sick call request form in his cell door. Medical staff entered the SHU every day—including RN Decker on many occasions—at least once a day to pass medications and perform sick call. Mr. Gilmore's sick call request form was taken from his cell door each day, but he was never examined or treated by BOP medical staff.  When he had the strength to do so, Mr. Gilmore banged on the cell door and yelled out when anyone would walk by in the hopes of receiving medical attention, but to no avail. Mr. Gilmore realized he was on the "no see" list—meaning that BOP medical staff had decided to stop taking him out of his cell for medical appointments.

BOP medical staff were aware of Mr. Gilmore's severe pain and need for medical treatment during this period but refused to provide any. This caused Mr. Gilmore to suffer severe chest pain without meaningful pain relief or treatment. Additionally, their inaction caused horrific mental suffering. As the days passed without any BOP employee responding to his cries for help and his

pain increased, Mr. Gilmore credibly believed they were leaving him in his cell to die. His belief was not unfounded, as it took the intervention of an officer who did not normally work in the SHU—as discussed below—to finally get Mr. Gilmore appropriate medical attention.

Also, during most of this eleven-day period, Mr. Gilmore was not provided his prescription medications, including his Coumadin. He did not receive his Coumadin immediately after he was transferred to the SHU on January 27, 2015, and he was not permitted to take it with him. Finally, on February 5 or 6, 2015, RN Decker asked Mr. Gilmore for a list of medications that Mr. Gilmore had not received since January 27, and Mr. Gilmore provided him with a list. But RN Decker continued to withhold any medical treatment, let alone take Mr. Gilmore from his cell for medical assessment. On February 7, 2015, Mr. Gilmore was given his prescribed medications, including his Coumadin. By that time, Mr. Gilmore had gone without his Coumadin for over a week. Mr. Gilmore took Coumadin for three days, from February 7, 2015 to February 9, 2015, but he was still experiencing intense pain in his chest.

**D.     A Correctional Officer Sees Mr. Gilmore in Severe Distress and He is Sent to the ER**

On February 9, 2015, Officer Johnston, a property officer who rarely worked in housing ranges, went to Mr. Gilmore's cell to tell him that his property would not be brought to the SHU because Mr. Gilmore would be sent back to his prior housing unit. Officer Johnson noted that Mr. Gilmore was visibly ill, and he contacted Officer Cox, who later sent EMT Aaron Nimz to see Mr. Gilmore.

EMT Nimz evaluated Mr. Gilmore and found him to be seriously ill and extremely weak. Mr. Gilmore told EMT Nimz that the pain was making it difficult to breath. Mr. Gilmore was in acute respiratory distress, had very low blood pressure, an accelerated heart rate, decreased breath sounds in both lower lobes, and dry oral mucous membranes. EMT Nimz

attempted to start an IV to administer fluids but was unsuccessful. EMT Nimz placed Mr. Gilmore on oxygen and took Mr. Gilmore's vital signs several times over the course of an hour and a half. Eventually, United States employee Dr. William Wilson, the facility Medical Director, authorized Mr. Gilmore to be transported to Union Hospital emergency room ("ER") to be evaluated to rule out a possible blood clot in his lungs. Mr. Gilmore was taken by ambulance to Union Hospital ER.

**E.     Mr. Gilmore's Treatment at Union Hospital**

Mr. Gilmore was admitted to the Union Hospital ER on February 10, 2015. In the ER, Mr. Gilmore was given a portable chest x-ray and a d-Dimer test, which was elevated. The elevated d-Dimer test indicated that Mr. Gilmore had a blood clot in his lower legs, which is where most blood clots form before breaking off and traveling to the lungs or other organs. Mr. Gilmore was given a CT angiogram, which is considered the "gold standard" for diagnosing a pulmonary embolism. Mr. Gilmore's test was inconclusive. The test was read as showing "limited evaluation of pulmonary emboli" and noted that "small emboli cannot be entirely excluded." Mr. Gilmore was then given a V/Q scan, another test for pulmonary embolisms. That test was read as "low probability of pulmonary emboli," but an ultrasound of Mr. Gilmore's lower legs was read as showing a partial clot in the femoral vein.

After the foregoing tests, critical care consultant Dr. Lawrence Dultz concluded that Mr. Gilmore likely had a recurrence of his thromboembolic disease. Yet medical professionals later suggested that Mr. Gilmore's condition was caused by Antiphospholipid Syndrome, which is an autoimmune disease that increases the likelihood of blood clots. Ultimately, Mr. Gilmore's treating physicians could not be certain what condition or combination of conditions caused his critical illness because his medical conditions were extremely complex. This includes a lack of certainty whether or not he experienced a pulmonary embolism.

Mr. Gilmore was in the hospital for 50 days and experienced a range of difficult and painful health conditions. On admission to the hospital, Mr. Gilmore was anemic, had an extremely elevated INR (of 14, when the therapeutic range was 2-3), and had impaired renal function. Mr. Gilmore required immediate treatment with Vitamin K, fresh frozen plasma, and blood transfusions. Mr. Gilmore was taken to the Intensive Care Unit ("ICU") and spent much of the 50 days there. During the 50 days, Mr. Gilmore was placed on a ventilator; he had emergency dialysis; he had a catheter surgically inserted into his femoral vein, and later had a different catheter surgically inserted in his jugular vein; at one point, he showed no signs of renal recovery and he was given a deathbed visit with his family; and he developed severe diarrhea, abdominal distention, metabolic acidosis, and Clostridium dificle colitis ("c-diff"), which was caused by the strong antibiotic medications administered during his hospitalization.

After progressing through these conditions and treatment for them, Mr. Gilmore's renal function improved, and his dialysis was discontinued. Mr. Gilmore had the catheter surgically removed from his jugular vein.

**F.    Mr. Gilmore Returned to FCI Terre Haute, But a Week Later Returned to the ER**

Mr. Gilmore was discharged from Union Hospital on April 1, 2015, with instructions to follow up with hematology and nephrology for ongoing care. A week later, on April 8, 2015, Mr. Gilmore again experienced excruciating pain, and Dr. Bailey, a doctor employed by the BOP, observed that Mr. Gilmore was severely ill.

Mr. Gilmore was again sent to the ER at Union Hospital where he remained through April 21, 2015, during which time he underwent several more treatments and surgical procedures, including dialysis and placing a new catheter in his jugular vein. Among other things, he was having continued difficulty with C-diff, which caused him to be dehydrated and possibly septic.

Mr. Gilmore's second hospitalization, pain, and health problems were a continuation of his health problems that led to his first hospitalization. The second hospitalization would not have occurred had Mr. Gilmore been provided adequate medical care by BOP medical staff in late January and early February 2015.

## G.     Mr. Gilmore Returns to FCI Terre Haute a Second Time

On April 21, 2015, when Mr. Gilmore was released from Union Hospital he was no longer on dialysis, but the catheter remained in his jugular vein in case condition deteriorated again, and additional dialysis was needed. The catheter caused Mr. Gilmore to feel a sharp pain in his neck.

## H.     BOP Medical Staff Failed to Properly Treat Mr. Gilmore

The BOP medical staff did not take reasonable steps to assess Mr. Gilmore's complaints of chest pain, considering his history of pulmonary embolisms, and Mr. Gilmore's reports that his symptoms were the same as his prior pulmonary embolisms. This was caused in part by a complete lack of continuity of care. BOP medical staff only treated Mr. Gilmore's symptoms in isolation, without reference to Mr. Gilmore's medical history or even his very recent history of continued complaints of severe chest pain. Nor did BOP medical staff appropriately consider Mr. Gilmore's fluctuating INRs throughout the year prior to his hospitalization.

The worst manifestation of the lack of continuity of care was that each BOP medical staff simply sent Mr. Gilmore back to his cell with little or no treatment or pain relief, no further testing, and the futile instruction to inform them if his pain increased or symptoms worsened. Yet when Mr. Gilmore repeatedly informed them over three days that his pain was increasing and health deteriorating, they did not respond accordingly. They continued telling him to come back if he felt worse, which he did, until they decided to stop seeing him. Proper medical treatment requires consideration of a person's medical history and continuity of care among medical providers,

neither of which occurred here.

The lack of continuity of care also undermines meaningful review of the medical records by upper-level providers. BOP medical staff who personally examined Mr. Gilmore suggested that they rely in part on the upper-level provider who co-signs their medical records to ensure their medical decisions were appropriate. But for this to be effective, direct providers would have to create detailed and accurate accounts of the examinations in the medical records, which did not happen here. For example, as noted above, PA Daugherty failed to note that Mr. Gilmore continued to experience severe chest pain when she examined him on January 29, 2015.

BOP medical staff breached the standard of care by not having a higher suspicion that Mr. Gilmore was suffering from another pulmonary embolism,[4] especially given his history of pulmonary embolisms and his repeated complaints of severe and increasing chest pain. This was in part due to the lack of continuity of care discussed above, but it was also because BOP medical staff refused to appropriately respond to Mr. Gilmore's subjective descriptions of his pain and symptoms; they based their medical judgment solely on things that could be objectively measured, which does not comport with the standard of care. Instead of simply giving Mr. Gilmore Tylenol—which did not treat the symptoms he was experiencing—BOP medical staff should have sent him to the ER for further testing, including a d-Dimer test.[5] If the direct providers would have taken

---

[4] It is ultimately irrelevant whether Mr. Gilmore had a pulmonary embolism. The purpose of sending him to the ER would have been to determine if he had a pulmonary embolism and, if not, determine the underlying cause of his severe chest pain and provide treatment for it.

[5] To be clear, the Court credits Mr. Gilmore's expert witness, Dr. Susan Lawrence, that the BOP medical staff should have sent Mr. Gilmore to the ER. Specifically, at least by his medical visits on January 29, 2015, the BOP medical providers who evaluated Mr. Gilmore should have known that the treatment being provided was insufficient and that a visit to the ER was medically necessary both to treat Mr. Gilmore's pain and to diagnose the underlying cause of his symptoms. The Court does not credit the United States' expert, Dr. John Buckley, that BOP medical staff's

Mr. Gilmore's complaints and symptoms more seriously, they would have taken the proper steps to ensure Mr. Gilmore was taken to the ER.[6]

Ultimately, instead of taking Mr. Gilmore's consistent complaints of severe and increasing chest pain seriously, RN Decker and PA Daugherty grew tired of him. This led them and others to completely ignore Mr. Gilmore for eleven days—providing no treatment or following up to check on Mr. Gilmore's continuing complaints of chest pain. There is no record that Mr. Gilmore was ever seen by medical staff from January 29, 2015 to February 9, 2015, when he was finally rushed to the hospital in critical condition. This is despite the fact that Mr. Gilmore requested sick call every day.[7] During this period, the conditions and symptoms he exhibited beginning January 26, 2015, progressively worsened. And, as described above, Mr. Gilmore was left to suffer tremendous physical pain and mental anguish without any medical treatment and without any knowledge that any medical treatment would be provided before he died. It is obvious that ignoring Mr. Gilmore and providing him with no treatment for these eleven days is inconsistent with the standard of care.

I.       **The Deficient Medical Care Caused Mr. Gilmore's Significant Pain and Suffering**

Failing to provide Mr. Gilmore with reasonable medical care for his worsening health

---

decisions were within the standard of care or the other aspects of his testimony that are inconsistent with the facts set forth herein.

[6] Whether the direct providers had the ultimate authority to send an inmate to the ER—or whether that requires approval from an upper-level provider—had the direct providers either explicitly requested that Mr. Gilmore be sent to the ER or appropriately conveyed the severity of the situation and recommended this course of action, the Court concludes that Mr. Gilmore would have been sent to the ER. The finger pointing at trial about lack of authority to order is unpersuasive given that the information communicated within the BOP medical record system by medical staff was inaccurate and overlooked pertinent information about Mr. Gilmore's condition history, and his care.

[7] Notably, RN Decker was in the SHU for sick call at 6:00 a.m. on February 9, 2015—when Mr. Gilmore requested sick call and was unquestionably in acute medical distress—but did nothing.

conditions caused him to develop additional health complications, including renal failure, requiring dialysis. The delay also resulted in Mr. Gilmore's lengthy hospitalization and re-hospitalization. By the time Mr. Gilmore was taken to the hospital he was facing multiple organ failures, which made it difficult to identify and treat the original underlying condition. The multi-system failure could have been avoided had the BOP medical staff promptly sent Mr. Gilmore— by January 29 at the latest—to the ER. This would have led to an earlier diagnosis of his symptoms and treatment for his pain, which would have prevented his condition from deteriorating to the extent it did and the corresponding suffering that this caused.

Earlier and appropriate diagnosis also would have led to a significantly shorter period in this hospital. Due to Mr. Gilmore's lengthy hospitalizations, he suffered from post-intensive care syndrome that included severe deconditioning, muscle loss, and severe weakness. He had to use a wheelchair and be re-trained to walk. These lengthy hospital stays, combined with the eleven-day period during which Mr. Gilmore believed he was being left to die in his cell, caused Mr. Gilmore to suffer from serious emotional distress, which even now requires the assistance of a psychiatrist and psychotherapist to treat. Mr. Gilmore continues to have difficulty sleeping at night because of this unnecessary ordeal.

In sum, Mr. Gilmore suffered prolonged and unnecessary pain because of the United States' failure to sufficiently investigate the origin of his chest pain and treat it accordingly. Mr. Gilmore's history of pulmonary embolisms and his underlying health conditions that were noted in his BOP medical records caused him to be in a hypercoagulated state, which meant that if he had any symptoms consistent with a blood clot, such as severe and increasing chest pain, a d-Dimer test should have been performed to rule out a blood clot. Had BOP medical staff ordered a routine blood test to check Mr. Gilmore's INR instead of simply stating that Mr. Gilmore's last

INR was therapeutic, they would have discovered his INR was not therapeutic—because of lack of proper dosage of Coumadin, or because of a more serious underlying cause like Antiphospholipid Syndrome. Failing to conduct that routine blood test despite Mr. Gilmore's year-long history of fluctuating INR results and his complaints of pain similar to his last pulmonary embolism, caused a delay in identifying the serious medical condition from which Mr. Gilmore was suffering. Moreover, the delay in diagnostic testing and treatment resulted in the progression of the condition to a critical state that caused Mr. Gilmore to suffer multiple organ failure and callously prolonged his pain.[8] It caused an unnecessarily long hospital stay, much of which was in the ICU, and a second hospitalization. Mr. Gilmore continues to suffer the physical and mental consequences from this deficient treatment.

## II.
## Conclusions of Law

**A.      Mr. Gilmore Proved the Three Element of His FTCA Claim**

The Federal Tort Claims Act ("FTCA") provides that the United States is liable for money damages for personal injury caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his or her employment if a private person would be liable to the claimant under the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1). Pursuant to the FTCA, "federal inmates may bring suit for injuries they sustain in custody as a consequence of the negligence of prison officials." *Buechel v. United States*, 746 F.3d 753, 758 (7th Cir. 2014).

---

[8] Again, the Court credits Dr. Lawrence's expert testimony regarding the consequences of the BOP medical staff's deficient medical treatment and does not credit Dr. Buckley's contrary testimony. This includes Dr. Lawrence's testimony that, although the deficient medical treatment did not cause Mr. Gilmore's Antiphospholipid Syndrome, if he had been timely sent to the ER his health outcomes would have been much better, and his hospitalization significantly shorter.

Tort law of the state where the tort occurred, in this case Indiana, applies when determining "whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries." *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008); *see also* 28 U.S.C. § 1346(b). Under Indiana law, Mr. Gilmore must prove (1) that the United States owed a duty to him; (2) that the United States breached that duty; and (3) that the breach proximately caused Mr. Gilmore's injuries. *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016); *see Brown v. United States*, 737 Fed. Appx. 777, 780 (7th Cir. 2018).

The parties do not dispute that the United States owed Mr. Gilmore a duty to provide him appropriate medical care under the circumstances, and the Court concludes that such a duty was owed. *See Sauders v. County of Steuben*, 693 N.E.2d 16, 18 (Ind. 1998).

Medical providers must "exercise that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class to which [they] belong[], acting under the same or similar circumstances." *Vergera by Vergera v. Doan*, 593 N.E.2d 185, 187 (Ind. 1992). The BOP medical providers failed to do this, and thus the United States breached its duty to Mr. Gilmore.

The foregoing findings of fact show that Mr. Gilmore had chest pains that persisted for several days and for which the United States provided him with no treatment. When Mr. Gilmore was seen by BOP medical staff he was not provided with any meaningful treatment for his pain, but was sent back to his cell and told to contact medical staff if his symptoms continued or worsened. Mr. Gilmore did so repeatedly, but BOP medical staff continued to provide the same

advice without investigating the cause of the pain or treating the pain, even when Mr. Gilmore was seen for continuing and worsening chest pain several times in three days.[9]

This neglect culminated in BOP medical staff refusing to see Mr. Gilmore for his severe chest pains and deteriorating health condition for eleven days—from January 29, 2015 to February 9, 2015. Even though Mr. Gilmore sought medical treatment during this period, his requests for a medical appointment were ignored, and the United States provided no treatment or care. By failing to treat Mr. Gilmore's pain or determine the cause of his pain, the United States failed to exercise reasonable care to preserve Mr. Gilmore's health and allowed his health to deteriorate to the point of needing emergency admission to the ICU. Ultimately, the United States' negligent treatment of Mr. Gilmore amounted to a breach of its duty to exercise reasonable care to preserve Mr. Gilmore's health when (1) when it failed to send Mr. Gilmore to the ER for further testing on January 29, 2015—when Mr. Gilmore was still able to see medical providers; and (2) when, for the next eleven days, it failed to do anything for him.[10] The former was at least negligent, while the latter was at least reckless.

The two categories of breaches set forth above proximately caused Mr. Gilmore substantial injuries. "Proximate cause requires that there be a reasonable connection between the defendant's

---

[9] Each medical record from Mr. Gilmore's medical appointments is cosigned by an upper-level provider. But for the purposes of an FTCA claim, it does not matter which BOP medical staff was the ultimate decision-maker. If the direct provider's decision did not meet the standard of care, then the upper-level provider's decision to not alter that course of treatment does not change the Court's evaluation of the treatment decision or the United States' liability. *See* 28 U.S.C. § 1346(b)(1) (stating that the United States is liable for "of any employee of the Government while acting within the scope of his office or employment"); *Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013) (same).

[10] As noted above, much of this conclusion stems from the fact that the Court credits Dr. Lawrence's testimony over Dr. Buckley's regarding the standard of care and that BOP medical staff failed to meet it. But it also stems from the fact that BOP medical staff ignored Mr. Gilmore for eleven days when he was in ever-increasing medical distress. This obviously does not comport with the standard of care.

allegedly negligent conduct and the plaintiff's damages." *Riley v. St. Mary's Medical Ctr. of Evansville, Inc.*, 135 N.E.3d 946, 951 (Ind. Ct. App. 2019). "Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct." *Id.*

Failing to take Mr. Gilmore's complaints of chest pain seriously, especially given his history of pulmonary embolisms, and failing to investigate the cause of his chest pain resulted in Mr. Gilmore suffering nearly two weeks of untreated pain. Additionally, it caused his underlying health conditions to remain undetected and untreated, and to worsen to the point of needing immediate hospitalization in the ICU. Mr. Gilmore has proven with reasonable certainty that the BOP medical staff's breaches caused his health to deteriorate to the point of requiring critical care and two extended hospitalizations. These hospitalizations included numerous invasive medical procedures, deterioration of his muscles from the long hospital stay, and a lengthy physical and mental recovery that remains ongoing.[11]

Because the United States had a duty to exercise reasonable care to preserve Mr. Gilmore's health; breached that duty by failing to treat Mr. Gilmore's continuing and worsening chest pain and failing to evaluate the cause of his chest pain; and caused Mr. Gilmore to suffer prolonged pain, two lengthy hospitalizations, and worsening health conditions, including multiple organ failure; the United States was negligent in failing to protect and preserve Mr. Gilmore's health while he was in custody. Therefore, under the FTCA, the United States is liable to Mr. Gilmore.

## B. Mr. Gilmore Was Not Contributorily Negligent

---

[11] The Court's conclusion regarding proximate causation is based in large part on the fact that the Court credits Dr. Lawrence's testimony on the matter. Specifically, the Court credits her assessment of proximate causation and the facts underlying it over Dr. Buckley's view. The particular harms the United States proximately caused are set forth in more detail above in Part I.

The United States resists this conclusion by arguing that Mr. Gilmore was contributorily negligent because he did not disclose that he was non-compliant with his Coumadin. "Under Indiana law, a plaintiff's contributory negligence in a medical malpractice case is a complete bar to recovery." *White v. United States*, 2018 WL 7888558, *3 (S.D. Ind. 2018) (citing *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 911 (Ind. 2009)). But, as set forth above, BOP medical staff were both aware of and caused certain periods of Mr. Gilmore's Coumadin non-compliance—including during the time immediately prior to Mr. Gilmore's hospitalization. The Court also found that, in any event, there is no credible evidence that Mr. Gilmore's Coumadin non-compliance—assuming he was non-compliant and that he informed BOP medical staff of this—would have changed their medical decisions. Accordingly, Mr. Gilmore was not contributorily negligent.

**C.     Damages Are Awarded Only for Deficient Medical Treatment by BOP Medical Staff Occurring in Late January and Early February 2015**

The parties dispute whether Mr. Gilmore's Notice of Tort Claim encompasses alleged deficient medical treatment following his first hospitalization and thus whether Mr. Gilmore exhausted his administrative remedies as to such conduct. The United States argues that Mr. Gilmore's Notice of Tort Claim only covers alleged deficient medical treatment in late January and early February 2015 because Mr. Gilmore's use of the phrase "in and out of the ICU," which occurred only during first hospitalization. But, even if the United States is correct, Dr. Lawrence testified that the second hospitalization was caused by BOP medical staff's deficient treatment in late January and early February 2015, which the parties agree was covered by Mr. Gilmore's Notice of Tort Claim. Accordingly, it is appropriate to award Mr. Gilmore damages from the second hospitalization, as that hospitalization was proximately caused by the conduct about which

Mr. Gilmore complains in his Notice of Tort Claim. The damages award below does not include damages caused by any alleged deficient medical treatment after the first hospitalization.

## D.     Award of Damages

Mr. Gilmore's damages encompass both the pain, suffering and emotional distress from the eleven-day period without any medical treatment, as well as pain, suffering, emotional distress from the additional health complications caused by the delay in treatment and the corresponding lengthy hospitalization. The Court assesses Mr. Gilmore's total damages at $375,000. A final judgment for Mr. Gilmore and against the United States for $375,000 shall issue.

**IT IS SO ORDERED.**

Date: 3/25/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

AMAR GILMORE
8019 Fayette Street
Philadelphia, PA 19150

Justin R. Olson
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
justin.olson2@usdoj.gov

Liberty L. Roberts
CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com

Rachel N. Woloshin
CHURCH HITTLE & ANTRIM (Fishers)
rwoloshin@cchalaw.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov